IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION


PETRA DEBOSE,                  )     CASE NO. 1:16-cv-01125

                          )

                Plaintiff,     )     JUDGE SARA LIOI

                          )

        v.               )     MAGISTRATE JUDGE

                          )     KATHLEEN B. BURKE

COMMISSIONER OF SOCIAL     )

SECURITY ADMINISTRATION,    )

                          )     **REPORT AND RECOMMENDATION**

                Defendant.     )

Plaintiff Petra DeBose ("Plaintiff" or "DeBose") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her applications for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation pursuant to Local Rule 72.2.

For the reasons set forth below, the undersigned recommends that the Court **AFFIRM** the Commissioner's decision.

## I.  Procedural History

DeBose filed her application for DIB on May 28, 2013, and her application for SSI on June 3, 2013.  Tr. 15, 63, 64.  She alleged a disability onset date of January 1, 2012.  (Tr. 15, 65, 73, 182), and alleged disability due to carpal tunnel syndrome, arthritis of neck, and talipes

1

cavus.[1] (Tr. 65, 73, 107, 117, 186). After initial denial by the state agency (Tr. 107-112) and denial upon reconsideration[2] (Tr. 117-121), DeBose requested a hearing (Tr. 122-124). A hearing was held before Administrative Law Judge Yelanda Collins ("ALJ") on February 11, 2015. Tr. 33-62.

In her March 20, 2015, decision (Tr. 12-30), the ALJ determined that DeBose had not been under a disability from January 1, 2012, through the date of the decision. Tr. 15, 25. DeBose requested review of the ALJ's decision by the Appeals Council. Tr. 9-11. On March 30, 2016, the Appeals Council denied DeBose's request for review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-4.

## II. Evidence

### A. Personal, educational, and vocational evidence

DeBose was born in 1966. Tr. 23, 146. At the time of the hearing, DeBose lived with her husband and 11-year old daughter. Tr. 40, 41. DeBose also has two adult children. Tr. 663. After high school, DeBose studied cooking for one year.[3] Tr. 41. Her past relevant work included work as a machine operator and home attendant. Tr. 23, 42-43, 58.

### B. Medical evidence

#### 1. Treatment records

##### a. Foot problems

---

[1] Talipes cavus means "exaggerated height of the longitudinal arch of the foot; it may be congenital or secondary to contractures of disturbed balance of the muscles." *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012 ("Dorland's"), at 1870.

[2] DeBose alleged only physical problems. Tr. 89. Upon reconsideration, however, it was noted that DeBose indicated on a function report that she had been sad, withdrawn and agitated and DeBose clarified that she was willing to attend exams as needed. Tr. 86-87.

[3] DeBose was born and attended school in Germany. Tr. 643.

On November 1, 2010, DeBose saw podiatrist Anthony M. Matalavage, DPM, for foot pain. Tr. 266-272. Dr. Matalavage debrided lesions, recommended arch supports that could be purchased from sporting goods stores, discussed custom orthotics, and ordered x-rays. Tr. 270. The right-foot x-ray was normal. Tr. 535. The left-foot x-ray showed degenerative arthritic changes of the first metatarsophalangeal joint. Tr. 536. Dr. Matalavage's diagnoses were keratoderma[4] foot, acquired[5] and foot pain. Tr. 270.

On January 22, 2012, DeBose presented to the emergency room of Kaiser Permanente Ohio with a primary complaint of right-foot pain. Tr. 290-295. DeBose reported a pain level of 8/10. Tr. 291. Devann M. Fullilove, RN, noted "[n]ormal foot appearance, no obvious problem." Tr. 291. Upon physical examination, DeBose exhibited a normal range of motion in her right ankle. Tr. 294. Also, in the right ankle, there was no swelling, no ecchymosis, no deformity and normal pulse. Tr. 294. DeBose was referred to podiatry with a recommendation for conservative therapy, partial weight bearing, and use of crutches for comfort. Tr. 291, 294.

On January 24, 2012, DeBose saw Dr. Matalavage. Tr. 296-301. DeBose reported that she was unable to place any weight on the front part of her right foot at the medial great toe to the top of the foot and up to her ankle. Tr. 298. DeBose denied any injury to her foot. Tr. 298. DeBose indicated that she was working, standing on her feet all day, in Dr. Sholl shoes and walking for 7 straight hours. Tr. 298. DeBose indicated that, following her emergency room visit, she had stayed off her foot for two days without relief. Tr. 298. X-rays were taken which showed osteopenia, no fracture, no erosions or periostitis, no masses or bone tumors or gas

---

[4] Keratoderma is "1. A horny skin or covering. 2. Hypertrophy of the stratum corneum of the skin[.]" *See* Dorland's, at 980.

[5] Acquired keratoderma is "secondary to another disease or condition, such as inflammation, a drug deficiency […]" *Id.*

noted.  Tr. 298.  Dr. Matalavage assessed foot pain; keratoderma foot, acquired; and tendonitis of foot.  Tr. 298-299.  Dr. Matalavage's plan included pairing or cutting of benign hyperkeratot, use of a walking boot until the pain resolved, and prednisone.  Tr. 299.

On May 25, 2012, during an office visit for sinus congestion, sore throat and ear pain, DeBose ambulated with no gait disturbance.  Tr. 305.

On April 4, 2013, DeBose saw Dr. Matalavage complaining that she was having difficulty walking bilaterally with "cramping" in her toes.  Tr. 331.  DeBose was reporting pain in the ball of her foot bilaterally and ankle pain.  Tr. 332.  Her pain had become worse over the prior two months.  Tr. 332.  On examination, Dr. Matalavage observed "cavus foot type" and pain in the joints and tendons but normal strength and full range of motion.  Tr. 334.  X-rays showed "[d]ecreased talar declination, increased CIA, increased 1st met declination ankle, diminished bone density[.]"  Tr. 334.  Dr. Matalavage assessed ankle joint pain; keratoderma foot, acquired; talipes cavus; and tendinitis of foot.  Tr. 334-335.  Dr. Matalavage prescribed a foot and ankle brace from Yanke Bionics.  Tr. 335, 337.

On June 3, 2013, DeBose followed up with Dr. Matalavage regarding her bilateral foot and ankle pain.  Tr. 352-357.  DeBose received her foot/ankle braces about a month prior but reported blistering to her left heel with use of the braces but she could not say for certain whether the blisters were caused by the brace or her OTC inserts.  Tr. 354.  She had returned to using her "crocs" because of the blisters and reported some healing.  Tr. 354.  She had received an adjustment to her right brace about week after she received the braces and indicated that the right brace was now comfortable.  Tr. 354.  Dr. Matalavage's diagnoses were keratoderma foot, acquired; talipes cavus; and ankle joint pain.  Tr. 355.  DeBose requested paperwork with her diagnosis for her disability claim.  Tr. 354.  Dr. Matalavage provided DeBose with the requested

paperwork, indicating that DeBose was receiving treatment for her conditions through bracing. Tr. 355. Dr. Matalavage debrided a callus, recommended that DeBose return in one month for re-evaluation following further use of the braces, and recommended that DeBose return to Yanke as necessary for adjustments to the braces. Tr. 355.

DeBose saw Dr. Matalavage again on July 1, 2013, (Tr. 540-544), with continued reports of blistering to her left heel with use of the braces (Tr. 541). DeBose had not returned to Yanke since her prior appointment. Tr. 541. Dr. Matalavage debrided a callus, instructed DeBose to return to Yanke for an adjustment, and to follow up with him in six weeks. Tr. 542.

### b.      Back, neck and shoulder problems

On April 1, 2013, DeBose saw her primary care physician Jianhua Wang, M.D., of Kaiser Permanente Ohio for joint pain in multiple sites (wrist, hip, feet, ankles and neck). Tr. 319. DeBose complained of having multiple joint pain and stiffness for a few years. Tr. 321. Also, DeBose indicated a history of low back injury, right shoulder injury, history of bilateral feet tendonitis, and bilateral carpal tunnel syndrome. Tr. 321. DeBose indicated that she was waking at night with numbness/tingling in her hands. Tr. 321. On examination, Dr. Wang observed mild tenderness at multiple MCP joints and PIP joints. Tr. 321. DeBose's range of motion in her cervical spine and low back was okay. Tr. 321-322. There was no impingement in either shoulder. Tr. 322. Dr. Wang's diagnoses were arthralgia of shoulder; arthritis of hand; arthritis of foot; knee joint pain; neck pain; and tobacco smoker. Tr. 322. Dr. Wang ordered a number of x-rays, referred DeBose to a rheumatologist; recommended carpal tunnel syndrome braces bilaterally; and strongly advised that DeBose quit smoking. Tr. 322.

Upon Dr. Wang's referral, on April 11, 2013, DeBose saw Rallis M. Rajan, M.D., of the rheumatology department for an evaluation of her complaints of "multiple joint myalgia for a

few years." (Tr. 339). Tr. 338-346. Dr. Rajan found that DeBose reported some difficulty in her right shoulder but she was able to raise her arm above her head. Tr. 344. Dr. Rajan noted that DeBose may have had a rotator cuff injury in the past but there was no medical evaluation of injury available for review. Tr. 344. Dr. Rajan noted that DeBose complained of chronic low back pain but also noted that DeBose's lumbar x-ray was unremarkable. Tr. 344. DeBose complained of right hip pain but she had a negative Faber and straight leg raise. Tr. 344. Dr. Rajan observed that DeBose's muscle strength was intact. Tr. 344. Dr. Rajan noted that DeBose was being treated by podiatry for tendonitis and recommended that DeBose follow up with podiatry regarding her ankle and foot pain. Tr. 344. Dr. Rajan referred DeBose to physical therapy for a TENS unit evaluation for DeBose's complaints of lower back and right shoulder pain. Tr. 344-345. Dr. Rajan advised that DeBose could continue with use of conservative treatment such as Tylenol and NSAIDS for pain control, topical creams or patches for additional pain relief, and cold/warm compresses. Tr. 344.

Upon Dr. Wang's referral, on May 13, 2013, DeBose saw Josephine Fernando, M.D, in the ortho department, for a consultation regarding her shoulder, neck and lower back pain. Tr. 346-352. On examination, Dr. Fernando observed some diffuse tenderness. Tr. 348-349. DeBose's left arm range of motion was normal and her range of motion in her hips was normal but she showed limited range of motion on extension of the lumbar spine. Tr. 349. Lumbar spine strength and sensation were normal. Tr. 349. Straight leg raising was negative; reflexes were equal bilaterally; gait and stability were normal; and heel/toe exam was fair. Tr. 349. Dr. Fernando ordered and reviewed x-rays of the lumbar spine. Tr. 523. The lumbar spine x-rays ordered during the May 13 visit were normal. Tr. 349, 523. Dr. Fernando indicated that an April 13 right shoulder x-ray was normal. Tr. 349. Dr. Fernando ordered c-spine x-rays. Tr. 349,

522.  The c-spine x-rays showed "mild reversal of the normal cervical lordosis.  Diffuse disk space narrowing is noted from C3-4 to the cervicothoracic junction with mild anterior osteophyte formation.  The precervical soft tissues are unremarkable."  Tr. 522.  Dr. Fernando assessed rotator cuff syndrome (R), low back pain, and chronic neck pain.  Tr. 349.  DeBose agreed to continue with the same NSAIDs and an MRI of the lumbar spine/right shoulder would be ordered with oral sedation.  Tr. 349.  DeBose was not inclined to proceed with cortisone injections of her shoulder or physical therapy for her shoulder/back.  Tr. 349.  On May 20, 2013, the MRIs ordered by Dr. Fernando were taken.  Tr. 520-521.  The lumbar spine MRI was unremarkable.  Tr. 520.  The right shoulder MRI showed "mild tendinopathy of the supraspinous tendon, without evidence for focal tendon tear.  Focal subchondral cystic changes of the greater tuberosity the proximal humerus."  Tr. 521.

Upon Dr. Fernando's referral, on July 10, 2013, DeBose saw Vasantha K. Kumar, M.D., in the pain management department, for a consultation for neck, shoulder and lower back pain.  Tr. 544-551.  During the visit, DeBose reported that her pain level was a 7/10, with her pain worsened by prolonged activity and helped with rest.  Tr. 546.  DeBose stated that she had tried physical therapy but physical therapy made things worse.  Tr. 546.  DeBose took NSAIDs as needed.  Tr. 546.  She had seen rheumatology and ortho.  Tr. 546.  DeBose indicated that her pain interfered with her general activities greater than 50% of the time.  Tr. 546.  On examination, DeBose appeared well and in no apparent distress.  Tr. 549.  DeBose was pleasant and cooperative.  Tr. 549.  Her mood was congruent.  Tr. 548.  She had an antalgic gait but ambulated without help.  Tr. 548.  DeBose's lumbrosacral spine area revealed no local tenderness or mass.  Tr. 549.  There was no facet tenderness. Tr. 549.  Myofascial spasm was present without trigger points.  Tr. 549.  Motor strength was 5/5 in the limbs.  Tr. 549.  Reflexes

and sensation were intact, straight leg raise was negative, and range of motion was full. Tr. 549. Dr. Kumar reviewed the MRI films and concluded that there was mild facet hypertrophy present no herniated disc. Tr. 549. Dr. Kumar diagnosed spondylosis – lumbar, cervical and myofascial pain. Tr. 549. Dr. Kumar recommended home exercises, a TENS unit trial, and meloxicam and tizandidine for pain control. Tr. 549. Dr. Kumar indicated that facet joint injections might be considered if DeBose's pain was unimproved. Tr. 549. On September 24, 2013, DeBose saw physical therapy for the TENS unit trial. Tr. 627-631. The physical therapist sent a note to Dr. Kumar indicating that DeBose had a favorable response to treatment with mild-moderately improved pain complaints in the cervical and lumber spine and that DeBose would likely benefit from a home TENS unit. Tr. 628. On October 7, 2013, DeBose met with the physical therapist for set up and education of a personal TENS unit. Tr. 638-641.

On May 2, 2014, DeBose saw Roger Goomber, M.D., in the pain management department, for complaints of chronic mid-back, low back and neck pain. Tr. 672-679. DeBose described the pain as constant – worse with activity and better with rest. Tr. 674. She indicated that the pain was a pressure like sensation shooting into her lower extremities, bilaterally. Tr. 674. DeBose reported that she was trying to manage her pain with meloxicam and tizanadine. Tr. 674. She relayed that she had gone to physical therapy the prior year and reported improvement in her pain. Tr. 674-675. She had benefited from the TENS unit but had run out of patches a few months prior. Tr. 675. On examination, Dr. Goomber observed that DeBose's gait was grossly normal; there was no subluxation noted on movement of bilateral upper extremities or head/neck; strength was 5/5 in bilateral upper and lower extremities; range of motion was within normal limits; and reflexes and sensation were intact. Tr. 676-677. Dr. Goomber concluded that DeBose's "history, physical exam, and imaging support a diagnosis of

chronic low back pain [and] chronic neck pain." Tr. 677. Dr. Goomber indicated that the recent MRIs and x-rays revealed minimal to no evidence of disease. Tr. 677. Thus, Dr. Goomber recommended that DeBose continue with conservative therapy, including home physical therapy. Tr. 677-678. Dr. Goomber noted that physical therapy reports reflected that exercises for DeBose's neck and back pain were not being done on a regular basis. Tr. 677. DeBose was provided handouts with exercises and those were discussed in detail. Tr. 677. Dr. Goomber refilled DeBose's prescriptions for meloxicam and tizanadine and noted that the company who distributed the TENS unit would be called for more patches. Tr. 677-678. Dr. Goomber advised DeBose that she should quit smoking because it worsens chronic pain. Tr. 677-678.

### c. Hand problems

During her April 1, 2013, appointment with Dr. Wang, it was noted that DeBose "has been diagnosed with bilateral cts [carpal tunnel syndrome], and wakes up at night with numbness/tingling in hands. Previous work up has not showed any clear etiology." Tr. 321. On examination, Dr. Wang observed mild tenderness at multiple MCP joints and PIP joints. Tr. 321. Dr. Wang assessed arthritis of hand and recommended carpal tunnel syndrome braces bilaterally. Tr. 322. April 1, 2013, hand x-rays showed "[n]o radiographic evidence of acute osseous, articular or soft tissue abnormalities." Tr. 483.

On July 24, 2013, Dr. Wang indicated that carpal tunnel syndrome was possible and an EMG was ordered to make a diagnosis of carpal tunnel syndrome. Tr. 555. A nerve conduction study was performed on August 16, 2013, the results of which were normal with no evidence of carpal tunnel syndrome or other neuropathy. Tr. 557-560.

On November 10, 2014, DeBose saw Dr. Wang due to finger pain and for completion of disability paperwork. Tr. 684-689. DeBose reported that her finger pain was mostly in her right

index finger. Tr. 688. Dr. Wang's objective findings were "right hand PIP joint is tender and swollen[;] [n]eurovascularly intact[;] no apparent distress[;] [and] [n]o leg edema." Tr. 688. Dr. Wang assessed pain in finger in right hand and advised DeBose to follow up with ortho for her right-hand finger pain since she had been seeing ortho for the issue. Tr. 688, 689. DeBose indicated that she needed her disability form updated. Tr. 688. She reported that nothing had changed; she still had a lot of pain in various part of her body. Tr. 688. Dr. Wang completed the disability paperwork. Tr. 689.

### d.    Mental health problems

Following a November 12, 2013, voluntary mental health triage telephone call with Kaiser Permanente (Tr. 657-660), on December 11, 2013, DeBose saw Constance Baker-Alden, LCSW, a psych social worker. Tr. 661-666. DeBose's chief complaint was "anger, anxiety, appetite disturbance, attention disturbance, depression, energy level, grief, irritability/anger, level of interest, medical problems, occupational problems, pain and sleep disturbance." Tr. 662. DeBose reported that she had been struggling with chronic pain for years and feeling worthless because she was no longer able to do things she used to, including work and things at home. Tr. 664. Ms. Baker-Alden diagnosed major depression, single episode, moderate and assigned a GAF score of 51-60.[6] Tr. 664-665.

---

[6] GAF (Global Assessment of Functioning) considers psychological, social and occupational functioning on a hypothetical continuum of mental health illnesses. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fourth Edition, Text Revision. Washington, DC, American Psychiatric Association, 2000 ("DSM-IV-TR"), at 34. A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* With the publication of the DSM-5 in 2013, the GAF was not included in the DSM-5. *See* American Psychiatric Association: *Diagnostic & Statistical Manual of Mental Health Disorders*, Fifth Edition, Arlington, VA, American Psychiatric Association, 2013 ("DSM-5"), at 16.

On January 8, 2014, DeBose saw Shila J. Mathew, M.D., for treatment of her mental health issues. Tr. 666-671. On examination, Dr. Mathew found that DeBose's affect was flat, she was cooperative; her mood was anxious and depressed; her speech was appropriate; there was no evidence of psychosis; her thought process was logical; her recent and remote memory were good; her insight and judgment were fair; her cognitive abilities were intact; and her motor behavior was hypoactive. Tr. 668. Dr. Mathew's clinical assessment was that DeBose was a patient "with chronic pain and depression. She is depressed that she cannot work. Cannot do things like she used to. Is in pain all the time. Have marital issues. The pain and her lack of productivity has affected her marriage." Tr. 669. Dr. Mathew diagnosed major depression, single episode, moderate, with a GAF score of 51-60. Tr. 669. Dr. Mathew prescribed Venlafaxine, an antidepressant. Tr. 669, 697. Treatment notes reflect that DeBose saw Dr. Mathew on March 19, 2014. Tr. 697. She then no showed for an appointment on June 3, 2014. Tr. 697. DeBose then saw Dr. Mathew on November 13, 2014, for follow up regarding her depression. Tr. 690-696. DeBose stated that she took her medication when she was able to afford it. Tr. 694. She continued to have "low-grade depression." Tr. 694. She was very unhappy in her marriage and unable to support herself. Tr. 694. DeBose reported being both physically and financially limited in her freedom to do things. Tr. 694. On examination, Dr. Mathew found that DeBose's affect was flat, she was cooperative; her mood was depressed; her speech was appropriate; there was no evidence of psychosis; her thought process was logical; her recent and remote memory were good; her insight and judgment were fair; her cognitive abilities were intact; and her motor behavior was hypoactive. Tr. 694. Dr. Mathew continued DeBose's medication and indicated that DeBose should follow up in three months. Tr. 694.

2. **Opinion evidence**

    a. **Treating physician(s)**

_Dr. Wang_

Dr. Wang completed "Medical Source Statements" in November 2013 and November 2014. Tr. 653-654, 680-681. In both statements, Dr. Wang opined that DeBose was limited physically due to arm, neck, hand, knee, back, and foot pain. Tr. 653-654, 680-681. More particularly, Dr. Wang opined that DeBose was limited to lifting/carrying more than 5 pounds occasionally and less than 5 pounds frequently; standing/walking a total of 1 hour in an 8-hour workday and sitting for a total of 2 hours in an 8-hour workday; DeBose's ability to climb, balance, stoop, crouch, kneel and crawl was rare; DeBose could occasionally reach, push/pull, and perform fine and gross manipulation; and DeBose had no environmental restrictions. Tr. 653-654, 680-681. Dr. Wang indicated that DeBose would need to alternate positions between sitting, standing and walking at will. Tr. 654, 681. Dr. Wang stated that DeBose had been prescribed a brace and TENS unit. Tr. 654, 681. Dr. Wang rated DeBose's pain as severe and indicated that her pain interfered with her concentration, would take her off task, and would cause absenteeism. Tr. 654, 681. Dr. Wang opined that DeBose would require unscheduled rest periods during an 8-hour workday outside of the normal breaks amounting to an additional 7 hours of rest on an average day. Tr. 654, 681.

In November 2013, Dr. Wang also offered his opinions regarding DeBose's mental capacity. Tr. 655-656. Dr. Wang opined that DeBose's ability to maintain attention and concentration for extended periods of 2 hour segments; ability to respond appropriately to changes in routine work settings; and ability to maintain regular attendance and be punctual

within customary tolerances; ability to complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; ability to carry out complex job instructions; and ability to understand, remember and carry out detailed, but not complex job instructions would be limited to occasional, i.e., ability for activity exists for up to one-third of a workday. Tr. 655-656. Dr. Wang opined that DeBose's ability to understand, remember and carry out simple job instructions would be limited to frequent, i.e., ability for activity exists for up to two-thirds of a workday. Tr. 656.

Also, on October 3, 2013, Dr. Wang authored a letter to Dr. Cornelia Schafer regarding the details of DeBose's conditions. Tr. 624-626. In conclusion, Dr. Wang stated that DeBose's prognosis was "Poor. As above history, [patient] has had these symptoms for over 5 years, thus the chance for recovering from these conditions is very low." Tr. 626.

### *Dr. Mathew*

On November 13, 2014, Dr. Mathew completed a "Medical Source Statement" regarding DeBose's mental capacity. Tr. 682-683. Dr. Mathew opined that DeBose had a rare ability, i.e., activity cannot be performed for any appreciable time, to maintain attention and concentration for extended periods of 2 hour segments; maintain regular attendance and be punctual within customary tolerance; deal with work stress; complete a normal workday and workweek without interruption from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; understand, remember and carry out complex job instructions; socialize; and relate predictably in social situations. Tr. 682-683. Dr. Mathew opined that DeBose had the occasional ability, i.e., ability for activity exists for up to one-third of a workday, to respond appropriately to changes in routine settings; deal with the public;

understand, remember and carry out detailed, but not complex job instructions; understand, remember and carry out simple job instructions; and behave in an emotionally stable manner. Tr. 682-683.  Dr. Mathew opined that DeBose had the frequent ability, i.e., ability for activity exists for up to two-thirds of a workday, to follow work rules; relate to co-workers; interact with supervisors; function independently without redirection; work in coordination with or proximity to others without being distracted; working in coordination with or proximity to others without being distracting; maintain appearance; and leave home on own.  Tr. 682-683.  Dr. Mathew explained that his assessment was supported by a diagnosis of major depression, single episode. Tr. 683.

### b.    Consultative examining  physician

On October 21, 2013, consultative examining psychologist Amber L. Hill, Ph.D., met with DeBose and conducted a psychological evaluation.  Tr. 642-650.  DeBose stated that her illness was "basically [her] aches and pains."  Tr. 642.  She added that "at times [she] feels sad and withdrawn due to limitations she is experiencing as a result of her physical medical concerns."  Tr. 642.   DeBose had not received and was not receiving at the time of Dr. Hill's evaluation any mental health treatment.  Tr. 645.   With respect to her mental health symptoms, DeBose stated, "I try to deal with it as best I can if I feel down."  Tr. 645.

Dr. Hill diagnosed DeBose with adjustment disorder with depressed mood, chronic and assigned a GAF score of 64.[7]  Tr. 647.  Dr. Hill concluded that DeBose appeared able to understand, remember and carry out instructions; maintain attention and concentration and perform simple and multi-step tasks; respond appropriately to supervisors and co-workers within

---

[7] A GAF score between 61 and 70 indicates "some mild symptoms (e.g., depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV-TR, at 34.

a work setting; and respond appropriately to work pressures within a work setting. Tr. 649-650. Dr. Hill noted that DeBose could have some limitations in her ability to maintain persistence and pace related to her reported depressive symptomology but limitations in that area would likely be improved if DeBose were to engage in mental health treatment related to her reported mental health concerns. Tr. 649.

### c.    State agency reviewing physician(s)

*Physical*

On July 3, 2013, state agency reviewing physician Leon D. Hughes, M.D., completed a physical RFC assessment. Tr. 68-70, 76-78. Dr. Hughes opined that DeBose could occasionally lift/carry 50 pounds; frequently lift/carry 25 pounds; stand/walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and push/pull unlimitedly other than as shown for lift/carry. Tr. 68-69. Dr. Hughes also opined that DeBose would have the following postural limitations - occasionally climbing ladders/ropes/scaffolds due to her shoulder pain. Tr. 69. Also, Dr. Hughes opined that DeBose would be limited to reaching overhead on the right occasionally. Tr. 70.

Upon reconsideration, on September 27, 2013, state agency reviewing physician Diane Manos, M.D., completed a physical RFC assessment. Tr. 90-92, 102-104. Dr. Manos opined that DeBose could occasionally lift/carry 50 pounds; frequently lift/carry 25 pounds; stand/walk about 6 hours in an 8-hour workday; sit about 6 hours in an 8-hour workday; and push/pull unlimitedly other than as shown for lift/carry. Tr. 90-91. Dr. Manos explained that the exertional limitations were due to back pain, myofascial pain, ankle pain, and shoulder pain. Tr. 91. Dr. Manos opined that DeBose would have the following postural limitations – frequently climbing ramps/stairs, balancing, stooping, kneeling, crouching, and crawling and occasionally

climbing ladders/ropes/scaffolds. Tr. 91. Dr. Manos explained that the postural limitations were

due to back pain, myofascial pain, ankle pain, and shoulder pain. Tr. 91. Also, Dr. Manos

opined that DeBose would be limited to reaching overhead on the right occasionally, noting mild

changes on imaging. Tr. 91. Dr. Manos further explained her RFC assessment indicating that

objective testing was generally normal, including an August 2013 nerve conduction study, which

showed no evidence of carpal tunnel syndrome or other neuropathy. Tr. 92.

*Mental*

Upon reconsideration, on October 31, 2013, state agency reviewing psychologist Karla

Voyten, Ph.D., completed a Psychiatric Review Technique ("PRT"). Tr. 88-89, 100-101. Dr.

Voyten opined that DeBose had no restriction of activities of daily living, mild difficulties

maintaining social functioning, mild difficulties maintaining concentration, persistence or pace,

and no repeated episodes of decompensation, each of extended duration (Tr. 88) and concluded

that DeBose did not have a severe mental impairment (Tr. 89). Dr. Voyten provided additional

explanation, stating "[d]espite reports of being 'crabby' most days with mood issues that 'come

and go,' [DeBose] presented with a completely normal MSE and reported the ability to complete

the majority of ADLs[.]" Tr. 89.

## C. Hearing testimony

### 1. Plaintiff's testimony

DeBose testified and was represented at the hearing. Tr. 39-56. In response to the ALJ's

question as to what DeBose felt prevented her from performing any kind of work, DeBose

indicated that her back, neck, shoulder, legs, everything hurt and she was could not sleep through

the night. Tr. 44-45. She was waking about every hour. Tr. 44. DeBose takes medication to

help her sleep, indicating "it lasts for a minute, but then I wake right back up."  Tr. 44.  She

wakes up because she has to constantly change positions.  Tr. 44.

DeBose has a driver's license.  Tr. 41.  During the week, she drives only to take her

daughter to and from school.  Tr. 41.  A friend drove her to the hearing.  Tr. 41.  DeBose wakes

up at 7:20 a.m. Tr. 44.  When DeBose wakes up, she makes herself a cup of coffee and takes her

daughter to school at 8:20 a.m.  Tr. 44-45.  When she returns home, she sits down for a minute

and then she tries to pick up around the house, sweep the floor, and rinse dishes and put them in

the dishwasher.  Tr. 45.  When doing household chores, such as sweeping, DeBose has to rest

between each room.  Tr. 52.  DeBose then sees what she can cook.  Tr. 45.  She indicated that

she cooks about every other day.  Tr. 45.  DeBose then picks her daughter up from school.  Tr.

45.  When they return home, DeBose's daughter takes about an hour break and then she works

on her homework.  Tr. 45-46.  DeBose prepares dinner.  Tr. 46.  After dinner, DeBose takes care

of the dishes and puts them in the dishwasher.  Tr. 46.

DeBose used to enjoy wood crafts and silk screening but was no longer able to perform

those hobbies.  Tr. 46.  She also used to do gardening.  Tr. 46.  DeBose watches television.  Tr.

47.  She cannot play with her daughter but she is able to go to her daughter's soccer games and

watch her cheerleading events.  Tr. 47-48.  Once in a while, DeBose and her family go out to

dinner for special occasions.  Tr. 48.  DeBose's husband usually does the grocery shopping but

DeBose will go with him on occasion.  Tr. 48.  When DeBose does go to a store, she leans on a

cart or uses a motorized cart.  Tr. 51.

For about a year, DeBose was seeing Dr. Matthew, a psychiatrist, and Connie Baker, a

counselor, for her depression.  Tr. 48-49.  DeBose is supposed to see her counselor once a month

but indicated she was not always able to do so because of finances.  Tr. 49.  She has a hard time

dealing with not being as active as she used to be due to her pain.  Tr. 49.  DeBose indicated that her depression takes a toll on her marriage.  Tr. 49.  DeBose smokes about 15 cigarettes each day.  Tr. 49-50.

DeBose estimated being able to sit for 30 minutes and stand for 30 minutes.  Tr. 50. DeBose does not walk too much except around her house.  Tr. 51.  DeBose wears braces on her feet every day.  Tr. 51-52.  Without her braces, she cannot walk at all.  Tr. 52.  The braces ease her pain.  Tr. 52.  DeBose uses a TENS unit for back.  Tr. 52-53.  She uses the TENS unit three times each day, which is the maximum amount she is able to use it.  Tr. 53.  DeBose can move a gallon of milk from the refrigerator to the table with her left hand.  Tr. 53-54.  DeBose has problems buttoning.  Tr. 54.  She used to be able to braid her children's hair but is no longer able to.  Tr. 54.  DeBose's doctors have prescribed splints for both of her hands, which she wears at night.  Tr. 54.  With respect to the problems with DeBose's hands, her doctors have gone back and forth between diagnoses of carpal tunnel syndrome and arthritis.  Tr. 55-56.  DeBose has had physical therapy for her shoulder but she is unable to reach overhead with her right shoulder.  Tr. 55.

### 2. Vocational expert's testimony

Vocational Expert Mark Anderson ("VE") testified at the hearing.  Tr. 56-62.

The VE described DeBose's past work as a machine operator as a medium level, semi-skilled position that DeBose performed at the heavy level.  Tr. 58.  The VE described DeBose's self-employment as a home attendant as a medium level, semi-skilled position.  Tr. 58.

The ALJ asked the VE to assume an individual who could perform a range of light work with occasional pushing and pulling with foot controls bilaterally; occasional pushing and pulling of hand controls bilaterally; occasional overhead reaching on the right; frequent handling

and fingering bilaterally; occasional climbing of ramps and stairs, balancing, stooping, kneeling, and crouching; no climbing of ropes, ladders, or scaffolds; no crawling; no exposure to hazards such as unprotected heights, moving mechanical parts, or operation of a motor vehicle; occasional vibration; and average production rate/pace but nothing that is fast or strict quotas. Tr. 58-59. The VE indicated that the described individual would be unable to perform either of DeBose's past jobs but there were light, unskilled jobs that the described individual could perform, including inspector and hand packager, electronic worker, and mail clerk. Tr. 59. The VE provided job incidence data for each of the identified jobs. Tr. 59.

The ALJ then asked the VE to assume that the described individual would need frequent, unscheduled breaks, causing her to be off task more than 20% of the workday or miss more than 2 days per month because of illness. Tr. 60. The VE indicated that both limitations would result in an inability to sustain full-time employment. Tr. 60.

DeBose's counsel then asked the VE to consider the first described individual but to reduce the exertional level to sedentary, with only occasional fingering and handling bilaterally. Tr. 61. The VE indicated that there was one job that the described individual could perform – credit information clerk (designated in the DOT as call out operator). Tr. 61-62. The VE explained that a credit information clerk uses a computer but is primarily on the telephone to look up and transmit credit information. Tr. 61-62. The VE indicated that there were an estimated 88,000 positions in the nation, 2,500 in Ohio, and 350 in northeast Ohio. Tr. 61.

### III. Standard for Disability

Under the Act, 42 U.S.C § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

can be expected to result in death or which has lasted or can be expected to last for a continuous

period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or
> mental impairment or impairments are of such severity that he is not only unable to
> do his previous work but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work which exists in the
> national economy . . . .

42 U.S.C. § 423(d)(2).

 In making a determination as to disability under this definition, an ALJ is required to

follow a five-step sequential analysis set out in agency regulations.  The five steps can be

summarized as follows:

> 1.     If the claimant is doing substantial gainful activity, he is not disabled.
>
> 2.     If the claimant is not doing substantial gainful activity, his impairment must
>        be severe before he can be found to be disabled.
>
> 3.     If the claimant is not doing substantial gainful activity, is suffering from a
>        severe impairment that has lasted or is expected to last for a continuous
>        period of at least twelve months, and his impairment meets or equals a listed
>        impairment, the claimant is presumed disabled without further inquiry.
>
> 4.     If the impairment does not meet or equal a listed impairment, the ALJ must
>        assess the claimant's residual functional capacity and use it to determine if
>        the claimant's impairment prevents him from doing past relevant work.  If
>        the claimant's impairment does not prevent him from doing his past relevant
>        work, he is not disabled.
>
> 5.     If the claimant is unable to perform past relevant work, he is not disabled if,
>        based on his vocational factors and residual functional capacity, he is
>        capable of performing other work that exists in significant numbers in the
>        national economy.

20 C.F.R. §§ 404.1520, 416.920;[8] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42, 96 L. Ed. 2d

119, 107 S. Ct. 2287 (1987).  Under this sequential analysis, the claimant has the burden of proof

---

[8] The DIB and SSI regulations cited herein are generally identical.  Accordingly, for convenience, further citations
to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20

at Steps One through Four.  *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

The burden shifts to the Commissioner at Step Five to establish whether the claimant has the

Residual Functional Capacity ("RFC") and vocational factors to perform work available in the

national economy.  *Id.*

## IV. The ALJ's Decision

In her March 20, 2015, decision, the ALJ made the following findings:[9]

1.   DeBose met the insured status requirements through December 31, 2014.  Tr. 17.

2.   DeBose had not engaged in substantial gainful activity since January 1, 2012, the alleged onset date.  Tr. 17.

3.   DeBose had the following severe impairments: degenerative disc disease of the cervical spine, mild tendinopathy/tendinitis of the right shoulder, arthritis of the bilateral hands v. carpal tunnel syndrome (CTS), and foot problems (talipes cavus).  Tr. 17.  DeBose's medically determinable mental impairment of major depression did not cause more than minimal limitation in DeBose's ability to perform basic mental work activities and therefore was non-severe.  Tr. 18-19.

4.   DeBose did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.  Tr. 19.

5.   DeBose had the RFC to perform light work except occasional pushing and pulling of hand or foot controls, occasional overhead reaching with the right upper extremity, frequent handling and fingering bilaterally, occasional postures including climbing ramps and stairs, balancing, kneeling, stooping and crouching but no climbing of ladders, ropes or scaffolds and no crawling, no hazards including unprotected heights, moving mechanical parts, operating a motor vehicle, occasional vibration, and limited to average but not strict production rate pace/quotas.  Tr. 19-23.

6.   DeBose was unable to perform any past relevant work.  Tr. 23.

C.F.R. § 404.1501 et seq.  The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds with 20 C.F.R. § 416.920).

[9] The ALJ's findings are summarized.

7.      DeBose was born in 1966 and was 45 years old, defined as a younger individual age 18-49, on the alleged disability onset date.  Tr. 23.

8.      DeBose had at least a high school education and was able to communicate in English.  Tr. 23.

9.      Transferability of job skills was not material to the determination of disability.  Tr. 23.

10.     Considering DeBose's age, education, work experience and RFC, there were jobs that exist in significant numbers in the national economy that DeBose could perform, including inspector/hand packager, electronic worker, and mail clerk.  Tr.  24.

Based on the foregoing, the ALJ determined that DeBose had not been under a disability from January 1, 2012, through the date of the decision.  Tr. 25.

## V. Parties' Arguments

DeBose first argues that the ALJ erred when she did not assign controlling weight to the opinions of her treating physician Dr. Wang regarding DeBose's physical functional limitations. Doc. 12, pp. 8-12.  Next, DeBose argues that the ALJ erred by not adequately accounting for manipulation limitations due to problems with her hands and right shoulder.  Doc. 12, pp. 12-13. DeBose contends that the RFC is insufficient and not supported by substantial evidence because it allows for frequent gross manipulation.  Doc. 12, p. 12.  Finally, DeBose argues that the ALJ erred by not finding that her major depression was a severe impairment.  Doc. 12, pp. 13-17.

In response, the Commissioner argues the ALJ complied with the treating physician rule when weighing the opinions of Dr. Wang.  Doc. 15, pp. 10-13.  Next, the Commissioner argues that no further restrictions beyond those included in the RFC were required to account for limitations in DeBose's hands and right shoulder.  Doc. 15, pp. 14-15.  Finally, the Commissioner argues that the ALJ properly considered and weighed the evidence regarding DeBose's mental health, substantial evidence supports the ALJ's finding that DeBose did not

have a severe mental health impairment, and no reversible error occurred at Step Two.  Doc. 15, pp. 15-18.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.  42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003).  "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).   The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive."  *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)).

A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility."  *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).  Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, a reviewing court cannot overturn the Commissioner's decision "so long as substantial evidence also supports the conclusion reached by the ALJ."  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).  When assessing whether there is substantial evidence to support the ALJ's decision, the Court may consider evidence not referenced by the ALJ.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

**A.      The ALJ  properly considered and weighed Dr. Wang's opinions**

DeBose contends that the ALJ erred when she did not assign controlling weight to the physical functional capacity reports of her treating physician Dr. Wang.  Doc. 12, pp. 8-11.

Under the treating physician rule, "[t]reating source opinions must be given 'controlling weight' if two conditions are met: (1) the opinion 'is well-supported by medically acceptable clinical and laboratory diagnostic techniques'; and (2) the opinion 'is not inconsistent with the other substantial evidence in [the] case record.'"  *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (citing 20 C.F.R. § 404.1527(c)(2)); *see also Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Gayheart*, 710 F.3d at 376; *Wilson*, 378 F.3d at 544.  In deciding the weight to be given, the ALJ must consider factors such as (1) the length of the treatment relationship and the frequency of the examination, (2) the nature and extent of the treatment relationship, (3) the supportability of the opinion, (4) the consistency of the opinion with the record as a whole, (5) the specialization of the source, and (6) any other factors that tend to support or contradict the opinion.  *Bowen v. Comm'r of Soc Sec.*, 478 F.3d 742, 747 (6th Cir. 2007); 20 C.F.R. § 404.1527(c).  An ALJ is not obliged to provide "an exhaustive factor-by-factor analysis" of the factors considered when weighing medical opinions.  *See Francis v. Comm'r of Soc. Sec.*, 414 Fed. Appx. 802, 804 (6th Cir. 2011).

After discussing in detail DeBose's allegations, her activities of daily living and medical evidence regarding her impairments (Tr. 20-21), the ALJ considered and weighed the medical opinion evidence (Tr. 22-23). With respect to Dr. Wang's opinions regarding DeBose's physical limitations,[10] the ALJ explained:

> [L]ittle weight is given to the physical capacity assessment completed by Dr. Wang dated November 8, 2013 because he found that the claimant is limited to less than sedentary work with lifting and carrying less than five pounds frequently, stand and walking only one hour and sitting for only two hours in an eight hour day and requires additional rest time of seven hours because this is not supported by the evidence in the record, which establishes that the claimant has normal range of motion and normal reflexes, sensation, and muscle strength (Exhibit 7F). Similarly, little weight is given to the physical capacity assessment that Dr. Wang completed on November 10, 2014, which is virtually identical to the November 8, 2013 assessment (Exhibit 1lF). The diagnostic tests and treatment notes do not support the limitations indicated in these opinions by Dr. Wang.

Tr. 22.

DeBose contends that the ALJ ignored Dr. Wang's findings that DeBose is limited to lifting and carrying less than five pounds frequently, standing and walking only one hour and sitting only two hours in an eight-hour day and requiring an additional seven hours of rest and, instead, focused on how the diagnostic testing and treatment did not support Dr. Wang's limitations. Doc. 12, p. 9. As is clear from the above excerpt from the ALJ's decision, the ALJ did not ignore Dr. Wang's limitations. Rather, the ALJ found that Dr. Wang's severe limitations were not supported by evidence in the record showing normal objective medical findings. Tr. 22. DeBose does not argue that there is no evidence of normal range of motion, normal reflexes, sensation and muscle strength as found by the ALJ. Furthermore, under the treating physician rule, an ALJ is expected to assess whether the opinions are supported by diagnostic testing and

---

[10] The ALJ also considered and weighed Dr. Wang's mental capacity assessment. Tr. 22. DeBose does not challenge the ALJ's assignment of weight to that opinion.

consistent with other evidence of record. This is what the ALJ did. Moreover, it is not for this Court to reweigh the evidence. *See Garner*, 745 F.2d at 387 (A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility.").

DeBose also argues that the ALJ ignored objective evidence that supported Dr. Wang's opinions. Doc. 12, p. 10. In particular, DeBose points to an x-ray of her cervical spine, which she states revealed "degenerative joint disease, retrolisthesis of C4 on C5 with suggestion of ligamentous laxity" and a shoulder x-ray, which she states revealed "mild tendinopathy of supraspinatous tendon, focal subchondrol cystic changes of the greater tuberosity proximal humerus of the right shoulder." Doc. 12, p. 10 (citing Tr. 523, 531). The transcript references cited by DeBose do not correlate to a cervical spine x-ray or right shoulder x-ray. *See* Tr. 523 (luboscaral spine x-ray results showing normal alignment); Tr. 531 (right hand x-ray results showing "no radiographic evidence acute osseous, articular or soft tissue abnormalities."). Notwithstanding DeBose's incorrect citations, there is evidence of a cervical spine x-ray with findings pertaining to the C4-C5 area (Tr. 528) and a right shoulder x-ray (Tr. 521). However, DeBose has not demonstrated that the ALJ did not consider this evidence when weighing Dr. Wang's opinions, nor has she shown that this evidence requires a finding that the ALJ's decision is not supported by substantial evidence.

The ALJ specifically referenced the right shoulder x-ray and observed that the imaging showed mild tendinopathy of the supraspinatous tendon and focal subchondrol cystic changes of the greater tuberosity proximal humerus. Tr. 21 (citing Exhibit 1F, p. 286). Additionally, the ALJ correctly observed that imaging showed that the mild tendinopathy was <u>without evidence of focal tendon tear</u>. Tr. 21, 521. Further, although the ALJ did not specifically cite to the cervical spine x-ray referencing the C4-C5 area, an ALJ is not required to discuss every piece of evidence

in order for a decision to be affirmed.  *See Thacker v. Comm'r of Soc. Sec.*, 99 Fed. Appx. 661, 665 (6th Cir. 2004).   Additionally, the ALJ did consider c-spine x-ray results taken in May 2013, which showed diffuse degenerative disk disease.  Tr. 21 (citing Exhibit 1F, p. 287), Tr. 522.   Finally, even if the evidence pointed to by DeBose could be deemed to provide support for Dr. Wang's opinions, here, there is substantial evidence to support the ALJ's determination that Dr. Wang's opinions were not supported by and/or were inconsistent with other evidence of record.  *See* Tr. 520 (unremarkable MRI of the lumbar spine); Tr. 521 (x-ray of right shoulder showing mild tendinopathy of the suprapinous tendon, without evidence of focal tendon tear); Tr. 523 (lumbosacral imaging showing normal alignment); Tr. 581-582 (Dr. Rajan's relatively normal objective medical findings); Tr. 548-549 (Dr. Kumar's relatively normal objective findings); Tr. 676-677 (Dr. Goomber's relatively normal objective findings and recommendation of conservative pain management treatment); *See Jones*, 336 F.3d at 477 ("[T]he Commissioner's decision cannot be overturned if substantial evidence, or even a preponderance of the evidence, supports the claimant's position, so long as substantial evidence also supports the conclusion reached by the ALJ.").

Based on the foregoing, the undersigned concludes that DeBose has not shown that the ALJ failed to sufficiently explain the weight assigned to the opinions of treating physician Dr. Wang or that the ALJ erred in not providing controlling weight to Dr. Wang's severe physical limitations.

**B.**     **The ALJ did not err by limiting DeBose to frequent handling and fingering bilaterally**

DeBose contends that the RFC limitation of frequent handling and fingering bilaterally does not sufficiently account for limitations caused by her shoulder and hand impairments.  Doc. 12, pp. 11-13.

The Regulations make clear that a claimant's RFC is an issue reserved to the Commissioner and the ALJ assesses a claimant's RFC "based on all of the relevant evidence" of record. 20 C.F.R. §§ 404.1545(a)(3), 404.1546(c). The ALJ, not a physician, is responsible for assessing a claimant's RFC. *See* 20 C.F.R. § 404.1546 (c); *Poe v. Comm'r of Soc. Sec.*, 342 Fed. Appx. 149, 157 (6th Cir.2009). In assessing a claimant's RFC, an ALJ "is not required to recite the medical opinion of a physician verbatim in [her] residual functional capacity finding[ ] [and] an ALJ does not improperly assume the role of a medical expert by assessing the medical and nonmedical evidence before rendering a residual functional capacity finding." *Id.*

DeBose appears to point to her own subjective allegations to demonstrate error with respect to the RFC. Doc. 12, p. 11. However, in formulating DeBose's RFC, the ALJ considered DeBose's allegations, including allegations regarding pain and limitations caused by her shoulder and hand impairments but concluded that DeBose's allegations were not entirely credible (Tr. 20) and DeBose has not challenged the ALJ's assessment of her credibility.

Additionally, in formulating DeBose's RFC, the ALJ considered objective testing, treatment records, medical opinion evidence, and activities of daily living. Tr. 20-23. To the extent that DeBose claims that the ALJ erred in not adopting the limitations contained in Dr. Wang's opinions with respect to her manipulative limitations, as discussed above, the undersigned finds no error with respect to the ALJ's decision to assign little weight to those opinions. Since the ALJ found that Dr. Wang's opinions were not entitled to controlling weight and that decision is supported by substantial evidence, the ALJ did not err in not including Dr. Wang's manipulative limitations in the RFC. *See, e.g., Infantado v. Astrue*, 263 Fed Appx. 469, 476-477 (6th Cir. 2008) (because substantial evidence supported ALJ's decision to provide no

weight to a medical opinion, failure to incorporate limitations from that opinion into the hypothetical question relied upon by the ALJ was not error).

Furthermore, DeBose's claim that the ALJ improperly relied upon the nerve conduction study results that showed no evidence of carpal tunnel syndrome when assessing manipulative limitations (Doc. 12, p. 12) is meritless. The nerve conduction study results were relevant to assessing the extent of DeBose's functional limitations. Additionally, DeBose's claim that there were carpal tunnel diagnoses that post-dated the August 2013 nerve conduction study is not supported by the records relied upon by DeBose (Doc. 12, p. 12 (citing Tr. 546, 552, 554, 561)). *See* Tr. 546 (Dr. Kumar - July 10, 2013, treatment notes); Tr. 552-555 (Dr. Wang – July 24, 2013, treatment notes, reflecting possible carpal tunnel syndrome and ordering referral to neurology for further assessment); Tr. 561 (Dr. Wang – April 1, 2013, treatment notes).

DeBose disagrees with the RFC limitation of frequent fingering and handling bilaterally and suggests that the ALJ should have included a more restrictive manipulative limitation. However, she has not shown that the ALJ failed to consider her shoulder or hand impairments nor has she demonstrated a basis upon which to conclude that greater manipulative limitations beyond those included in the RFC were necessary to account for any limitations caused by her shoulder and hand impairments.

## C.     The ALJ did not err at Step Two when finding no severe mental impairment

DeBose argues that the ALJ erred by not finding that her major depression was a severe impairment and not accounting for mental health restrictions relating to her depression in the RFC. Doc. 12, pp. 13-17.

At Step Two, the claimant must show that he has a severe impairment, meaning an "impairment or combination of impairments which significantly limits your physical and mental

ability to do basic work activities." *See* 20 C.F.R. § 404.1520(c).  Basic work activities are the abilities and aptitudes necessary to do most jobs. 20 C.F.R. § 404.1522.  Examples of these include physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; capacities for seeing, hearing and speaking; understanding, carrying out, and remembering simple instructions; use of judgment; responding appropriately to supervision, co-workers and usual work situations; and dealing with changes in work environments.  *Id.*

Plaintiff carries the burden of proving the severity of her impairments. *Allen v. Apfel*, 3 Fed. Appx. 254, 256 (6th Cir. 2001) (*citing Higgs v. Bowen,* 880 F.2d 860, 863 (6th Cir.1988)).  A claimant's impairment will be construed as non-severe only when it is a "slight abnormality which has such a minimal effect on the individual that it would not be expected to interfere with the individual's ability to work irrespective of age, education and work experience." *Farris v. Sec'y of HHS*, 773 F.2d 85, 90 (6th Cir. 1985) (*citing Brady v. Heckler,* 724 F.2d 914, 920 (11th Cir.1984)).  Step Two of the sequential evaluation "has been construed as a *de minimis* hurdle in the disability determination process."  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).  However, as noted by the *Higgs* court, a diagnosis alone "says nothing about the severity of the condition."  *Id.* at 863.

Further, while Step Two is considered a *de minimis* hurdle, when assessing whether a mental impairment is severe, "the regulations provide that if a claimant's degree of [mental] limitation is none or mild, the Commissioner will generally conclude the impairment is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in" a claimant's "ability to do basic work activities."  *Griffieth v. Comm's of Soc. Sec.*, 217 Fed. Appx. 425, 428 (6th Cir. 2007) (quoting 20 C.F.R. § 404.1520a(d))(internal quotations omitted).[11]

---

[11] 20 C.F.R. § 404.1520a was amended on January 17, 2017, and then again on March 27, 2017.  Neither party asserts that the amended versions apply in this case.  Further, since the ALJ decision being reviewing was issued on

Here, in accordance with the regulations, the ALJ rated the degree of DeBose's limitation in  the four broad functional areas of activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation.  Tr. 18-19.  Considering the evidence as a whole, including the opinion of Dr. Hill, the consultative examining psychologist, which reflected mild limitations; DeBose's limited and sporadic treatment history; Dr. Mathew's description of DeBose's depression as low-grade; and DeBose's activities of daily living, the ALJ concluded that DeBose had mild limitations in activities of daily living (Tr. 18), mild limitations in social functioning (Tr. 18), mild limitations in concentration, persistence or pace (Tr. 18), and no episodes of decompensation (Tr. 19).   Since the ALJ determined that DeBose had no more than <u>mild</u> limitations in the first three broad functional areas and <u>no</u> episodes of decompensation, the ALJ concluded that DeBose's mental impairment of major depression was not severe.  Tr. 18-19.

DeBose claims that, in concluding that she had only mild limitations in the three functional areas, the ALJ ignored evidence of her marital problems and ignored opinion evidence from her treating psychiatrist Dr. Mathew.  Doc. 12, p. 16.  However, DeBose is incorrect.  The ALJ acknowledged evidence of DeBose's marital problems.  Tr. 18 (citing Exhibits 6F, 9F, 13F). The ALJ also considered treatment notes from DeBose's treatment with Dr. Mathew and considered and assigned little weight to the opinion of Dr. Mathew (Tr. 18, 22-23).   Thus, the ALJ did not ignore evidence regarding DeBose's martial problems or Dr. Mathew's opinion.

DeBose also argues that the ALJ's determination was based only on DeBose's ability to perform activities of basic daily living.  Doc. 12, p. 15.   However, as is clear from the decision,

March 20, 2015 (Tr. 12-30), the version of 20 C.F.R. § 404.1520a, effective June 13, 2011, to January 16, 2017, is applied.

the ALJ relied upon other evidence, including her limited and sporadic mental health treatment history (Tr. 18), opinion evidence from Dr. Hill (Tr. 18, 22), and opinion evidence from Dr. Voyten, who concluded that DeBose did not have a severe mental impairment (Tr. 22, 89).

Based on the foregoing, the undersigned concludes that the ALJ's Step Two finding that DeBose did not have a severe mental impairment is supported by substantial evidence.

Additionally, where an ALJ finds one severe impairment and continues with subsequent steps in the sequential evaluation process, error, if any, at Step Two may not warrant reversal. *See Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987) (the Commissioner's failure to find claimant's cervical condition severe was not reversible error because the Commissioner did find a severe impairment and continued with the remaining steps in the sequential evaluation process*); see also Anthony v. Astrue*, 266 Fed. Appx. 451, 457 (6th Cir. 2008) (relying on *Maziarz* when finding that, because the ALJ had found other impairments severe, the fact that some other impairments were found to be non-severe at Step Two was not reversible error). Here, the ALJ found other severe impairments and proceeded with the subsequent steps in the sequential evaluation process. Throughout those subsequent steps, the ALJ considered evidence regarding DeBose's mental impairment (Tr. 22-23) and included in the RFC a mental restriction in the RFC, limiting DeBose to "average but not strict production rate pace/quotas." (Tr. 19). Thus, even if the ALJ erred at Step Two, since the ALJ considered DeBose's mental impairment at subsequent states in the evaluation process and when assessing her RFC, reversal is not warranted.

## VII. Recommendation

For the foregoing reasons, the undersigned recommends that the Court **AFFIRM** the

Commissioner's decision.

April 12, 2017

_____
Kathleen B. Burke
United States Magistrate Judge


## OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).